549 A.2d 1282

**Regina CURCIO**

v.

**Dennis CURCIO, Appellant.**

Superior Court of Pennsylvania.

Argued May 10, 1988.

Filed Oct. 24, 1988.

Reargument Denied Dec. 16, 1988.

Nicholas J. Lisi, Philadelphia, for appellee.

Before MONTEMURO, TAMILIA and JOHNSON, JJ.

PER CURIAM:

Order Affirmed.

TAMILIA, J., filed a dissenting opinion to be published.

TAMILIA, Judge, dissenting:

I respectfully dissent to the holding of the majority as I believe the trial court has not adequately considered the

salient issue of what is the best interest of the child in awarding shared custody to the parents. As quoted by the majority from the excerpt of the trial court Opinion:

Regina spends a considerable amount of time with her paternal grandparents, as she resides in their home. Defendant testified that his night-shift work prompted him to place his daughter at his parents' home over the course of the past three years. . . . It is this court's opinion that the true "custodians" of Regina have been neither of the parties, but the paternal grandparents. It has been the paternal grandparents who have fed Regina and seen to her daily care. Testimony from the defendant indicated that Regina even took her vacation with her grandparents.

(Slip Op., Jackson, J., 12/4/87, p. 2.)

The trial court went on to find that since the paternal grandparents were the de facto custodians, the amount of time spent with each parent was equal. From this latter determination, the trial court went on to conclude that the parents were, therefore, entitled to share equally in the custody as there previously had been an equal amount of time spent with the child by both of them. This reasoning ignores a number of other important considerations that are essential to a determination of the child's best interest. Pursuant to our scope of review in custody matters, as detailed in *Commonwealth ex rel. Robinson v. Robinson*, 505 Pa. 226, 478 A.2d 800 (1984), I would find that the factual conclusions of the trial court are not supported by incontrovertible factual findings required for a modification of the de facto partial custody arrangements in this case and, in fact, the trial court's conclusions in awarding shared custody are unreasonable in light of inadequate evidence to support them.

While the father's contention there has been no showing of a substantial change of circumstances justifying a change in the status quo cannot be ignored, this consideration has been considerably reduced by the recent ruling in *Karis v. Karis*, 518 Pa. 601, 544 A.2d 1328 (1988). "[W]e hold that a petition for modification of a partial custody to a

shared order requires the court to inquire into the best interest of the child regardless of whether a "substantial change in circumstances has been shown." *Id.* at 607–608, 544 A.2d at 1332.[1]

While the prerequisite of a change in circumstances is not required to permit a review of a petition for change in custody, particularly where, as here, the modification requested is from partial custody to shared custody, that review must consider the rules of law which hold that a child's placement should not be disturbed unless it is in the child's best interest. *Eglekamp v. Eglekamp*, 362 Pa.Super. 269, 524 A.2d 501 (1987). That principle is contained in the concept that has prevailed throughout modern times that a change of circumstances which is in the child's best interest must be established before it results in a child's placement being disturbed. The change of circumstance found by the court was that the husband planned to remarry within a few weeks and to move into his wife's new home (Slip Op. at 3) and his intent to have Regina come live with him. In evaluating this change, the court found that both parents were fit and it was in Regina's best interest that she spend more time with each parent. However, equally if not more relevant in the review of changed circumstances is a consideration of whether the mother's mental condition has stabilized and the child's interaction with her has improved to the point where the child's best interest will

---

1. *Karis* involved a petition for change in a custody agreement incorporated into a court Order. While the Supreme Court ruled in *Karis* that the inquiry into changed circumstances is not required, citing lack of such requirement in the Custody and Grandparents' Visitation Act, 23 P.C.S. § 5301 *et seq.*, query whether the legislative intent was to eliminate such a requirement in light of the more recent legislation amending the Divorce Code in February 1988, Act 13, Section 401.1, 23 P.S. § 401.1, which provides:

   **Section 401.1  Effect of agreement between the parties**
       (b) A provision of an agreement regarding child support, visitation or custody shall be subject to modification by the court *upon a showing of changed circumstances.* (Emphasis added.)
   If we apply *Karis* in its broadest sense, then we must ignore the amendment to the Divorce Code of February 12, 1988. It will also require future clarification as to whether the *Karis* holding is limited to cases in which the requested modification is from sole custody or partial custody to shared custody.

permit shared custody. This case very clearly illustrates that in determining what is in the child's best interest, it is necessary to review the case in totality to determine if circumstances have changed. If they have not changed, the father is correct in requesting denial of the petition for modification as the child's best interest would not be served by awarding shared custody.

To evaluate the change of circumstances, it is necessary to consider the exhaustive and voluminous record which preceded the present hearing. My review of that record convinces me that initially the trial judge (different than the present one) made an erroneous determination that shared custody was *required* by law and which he attempted to implement.[2] The transcript of October 21, 1982, p. 38, discloses that Judge Rosenwald stated: "The law requires shared custody." This assumption permeated all subsequent proceedings. Despite that conclusion after many subsequent hearings, he alternated between temporary orders of no custody and partial custody, which ultimately resulted in de facto custody in the paternal grandparents and partial custody in each parent. At the outset of one of the earliest hearings, Judge Rosenwald also stated: "This child is being destroyed by the hostility that each one of you has for the other. The hatred you have for him the hatred he has for you is really disturbing that child. What you are doing is creating a situation where that child is going to be on a psychiatrist's couch for a long period of time." (T.T.

**2.** The Custody Act, 23 P.C.S. 5301 *et seq.* provides as follows:
**§ 5303. Award of sole custody**
In making an order for custody to either parent individually, the court shall consider, among other factors, which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the *non*custodial parent and the child. The court *shall award sole custody when it is in the best interest of the child.* (Emphasis added.)
**§ 5304. Award of shared custody**
An order for shared custody may be awarded by the court when it is in the best interest of the child:
    (1) upon the application of one or both parents;
    (2) when the parties have agreed to an award of shared custody; or
    (3) in the discretion of the court.

7/26/82, pp. 2–3.) At that time, Judge Rosenwald had extensive voire dire with the child which disclosed the child was so disturbed about visitation with the father that psychiatric and psychological evaluations were ordered, with overnight visits curtailed, pending their outcome. In June 1983, the problem had abated and the father had Regina for a period of summer vacation. Two days into the vacation, the father was told to keep the child by his attorney as the mother appeared to be suffering from a mental illness. On June 13, 1983, testimony was received from a psychologist that the mother was disturbed and the child might be in jeopardy (T.T. at 5). Subsequently, the child was fearful of returning to the mother. On one occasion when he was returning the child, the mother met the father at the door with a knife and a rock and shouting obscenities and Regina refused to go into the house (T.T. 9/30/83, p. 34). There was also testimony about the mother putting librium into the child's orange juice and that her behavior was bizarre, shouting obscenities, harassing the father and neighbors, accusing appellant of tapping her phones, and telling children and other people at a birthday party that she was the Virgin Mary. Dr. Bonovitz, her psychiatrist, testified she was manic depressive upon her admission to Mercy Hospital, and her self-discharge after two weeks was against medical advice as she was only 50 to 60 per cent improved.

Extensive testimony from psychological and psychiatric experts was taken on September 30, 1983, relating to the mother's mental condition and in one instance concerning testing of the child. As to the child, Regina, Dr. Bricklin testified test results showed seven responses favoring remaining with the father and none for returning to the mother which was a very unusual finding (*Id.* at 243). Further, he testified test results showed that from interaction with the mother, Regina has become potentially suicidal (*Id.* at 246). He tested the father also, with favorable results for parenting but the mother refused to be tested (*Id.* at 247–48). Based on his testing, his opinion was that extended contact with the mother would be psychologically

harmful, whereas contact with the father would not be (*Id.* at 251–52). Dr. Bricklin was a neutral psychologist, testifying for the court.

Following these hearings and others in 1984 and 1985, there was a gradual return to the implementation of the original Order to the degree that while the father had technical sole custody, with the mother having partial custody, de facto custody was in the grandparents with partial custody in both parents.

Where I strongly differ with the majority is that I believe the trial court did not pursue the searching enquiry necessary to review, that the record demonstrates the modification of the custody Order is in the best interest of child. Where the Opinion of the court is not supported by the record and the record itself was inadequate for a determination of the ultimate issue of change in custody, a remand is required. *Murphey v. Hatala,* 350 Pa.Super. 433, 504 A.2d 917 (1986). I do not agree with appellant that the original custody Order, with the father having sole custody and the mother having partial custody, is the status quo. Judge Jackson correctly determined that the grandparents are the true custodians. I believe he erred in permitting both parents to share custody and dissolving the status quo without first determining that the mother can function under the greatly increased strain of a shared custody arrangement, hearing testimony from the prospective wife of the father, who will participate in the custody arrangement, and above all, ascertaining the wishes of the child about the proposed shared custody plan.

One thing is clear from a thorough review of this record and that is, after a terribly stormy and continuous period of disputed custody in which there was violence and mental disturbance swirling about the child, who was at one time described as potentially suicidal, there has been an accommodation in which she now has a relationship with both parents and professes love for both. While the trial judge interviewed Regina (T.T. 8/18/87, pp. 2–8, recorded and transcribed separately for the court), he did not question her about her wishes in going to live part-time with her

father and stepmother and part-time with her mother. The testimony elected only that she got along "good" with her father, mother and paternal grandparents under present arrangements.

While the trial judge professes a philosophy which avoids forcing a child to voice a decision, in a case such as this, it is unavoidable.[3] The transcript of his interrogation of Regina does not disclose how she would react to the proposed arrangement, and since no witnesses other than the parents were called to ascertain their interaction and adjustment and no inquiry was made of the child concerning these matters, we cannot determine from the record whether this change is in the child's best interest. Regina has been through enormous emotional trials in the course of the nine years of hotly contested custody. She has been interviewed by judges, lawyers, psychologists, psychiatrists and badgered by her parents in the process. Out of it she appears to have survived as an intelligent and mature thirteen year old who most certainly can be asked what is the present rela-

3. During the proceeding, the following dialogue transpired:

(Child's examination is recorded and transcribed separately for the Court.)

MR. FIORETTI: Before you bring the parties in, you didn't ask her what her preference was.

THE COURT: I never do and I don't because there are a lot of other factors in making a ruling. If I ask a child what would you like to do, who would you like to be with and they give me an answer and then I make a decision based upon a lot of other factors beside what they want to do, then if some of those factors have made me decide differently than what I've stated, then the child is very disappointed with humanity. I told him that I wanted to go with X or I told him that I wanted to go with Y. Why didn't the Judge listen to me? Well, we don't let parents be the sole guiding light as to what the child would do and I'm of the opinion that if we don't let the parents dictate to us, we shouldn't let the children make the overwhelming decision and that's why I have to answer your question, Judge, you didn't ask the child what she would like to do. For that simple reason. I don't want the child coming back and saying well, I said X or I said Y and he did something different. With all due respect to you, Mr. Fioretti, that's exactly why I did it.

MR. FIORETTI: I understand that's one of the factors in making a custody determination, preference of the child.

THE COURT: Not when you might get an answer that's going to be contradictory to what the total picture is.

(T.T. 8/18/87, pp. 69–70.)

tionship between her and her parents, her desires to leave the shelter of the grandparents home to what may be a ping-pong existence of shared custody, and how much time she would like to spend with the grandparents if shared custody is acceptable.[4] While the grandparents have not petitioned the court for this purpose, I believe it is incumbent upon this Court to make this inquiry on his own under the circumstances of this case. To disturb an apparently stable adjustment after the years of turmoil, without such an inquiry, is not in Regina's best interest. *See Commonwealth ex rel. Pierce v. Pierce,* 493 Pa. 292, 426 A.2d 555 (1981); *Bresnock v. Bresnock,* 346 Pa.Super. 563, 500 A.2d 91 (1985).

I would, therefore, remand for further testimony as to the mother's present mental condition and treatment, testimony from the proposed stepmother, testimony from the grandparents as to their visitation rights and above all interrogation of Regina as suggested above.

4. **§ 5313. When child has resided with grandparents**
  If an unmarried child has resided with his grandparents or great-grandparents for a period of 12 months or more and is subsequently removed from the home by his parents, the grandparents or great-grandparents may petition the court for an order granting them reasonable partial custody or visitation rights, or both, to the child. The court shall grant the petition if it finds that visitation rights would be in the best interest of the child and would not interfere with the parent-child relationship.